Filed 10/1/14  P. v. Garcia CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B247846 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA072544) |
| v. | |
| MELVIN GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Daniel B. Feldstern, Judge.  Affirmed as modified.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Melvin Garcia appeals from a judgment entered after a jury found him guilty of attempted voluntary manslaughter and assault with a firearm, and also found firearm and great bodily injury enhancements to be true.  The trial court sentenced him to 18 years and six months in prison.  Garcia contends the trial court erred in failing to instruct the jury sua sponte on the defense of unconsciousness, in failing to finding the victim's provocation as a mitigating factor precluding an upper term sentence, and in its improper dual use of facts in making its sentencing choices.  We reject these contentions.  As explained below, we modify the judgment to reflect the correct amount in court security fees under Penal Code section 1465.8.[1]  As so modified, we affirm.

## BACKGROUND

After shooting Jaime Solis, Garcia was charged with willful, deliberate and premeditated attempted murder and assault with a firearm.  The information also alleged firearm and great bodily injury enhancements.

At trial Garcia admitted he shot Solis, but his counsel argued he did not commit attempted murder.  Defense counsel urged the jury to find Garcia guilty of the lesser offense of attempted voluntary manslaughter under a theory of imperfect self-defense.  Defense counsel also argued heat of passion as an alternative theory supporting attempted voluntary manslaughter.

**Prosecution Evidence**

Defendant Garcia and victim Jaime Solis lived in the same apartment complex in Panorama City.  Garcia lived in a lower level unit with his girlfriend, Martha Pineda.  Solis lived directly above them in an upper level unit.  Jose Arturo Vasquez, who witnessed Garcia shoot Solis on January 27, 2012, lived in a lower level unit near Garcia's apartment.[2]

[1] Further statutory references are to the Penal Code.

[2] Solis, Pineda and Vasquez testified for the prosecution.  At the time of trial, Pineda still considered Garcia to be her boyfriend and Vasquez considered both Solis and Garcia to be his friends.

2

In the evening on January 27, 2012, Solis was in his apartment with Vasquez and two other guests listening to music and drinking beer. During the course of the evening, Solis told Vasquez he wanted to move out of his apartment because the apartment manager told him Garcia and Pineda had been complaining about noise coming from Solis's apartment. Neither Garcia nor Pineda had ever complained directly to Solis. Solis did not believe the noise complaints were valid. Vasquez suggested Solis go downstairs and talk to Garcia about the noise issue.

After drinking six to eight beers over a two-hour period, Solis left his apartment and walked downstairs with Vasquez. Solis planned to move his car into his assigned parking space and Vasquez planned to go home to his own apartment. As they walked by Garcia's apartment, one of the men called Garcia's name.[3] Garcia appeared on his patio and opened the gate. Solis and Vasquez entered Garcia and Pineda's patio. Pineda was in the living room of her apartment. A sliding glass door separated the patio from the living room. Pineda's 14-year-old daughter and eight-year-old grandson also were inside the apartment.

Garcia brought Solis a beer, which Solis accepted. Garcia and Solis engaged in casual, friendly conversation. Then, Garcia and Solis began to argue.

According to Pineda, who was listening to the conversation from the living room, Solis spoke to Garcia in a disrespectful and aggressive manner, while Garcia remained calm. Solis asked Garcia if the music Solis was playing was bothering Garcia. Solis began insulting Garcia, calling Garcia a "son of a bitch," and a "cerote" (a Salvadoran expression meaning "piece of shit"). Solis also asked Garcia if it bothered him that Solis "had loud sex with his [Solis's] wife upstairs." Pineda's young daughter and grandson were in earshot while Solis made "vulgar" comments. Solis told Garcia, when Garcia and Pineda "made carne asada, he felt like coming out to the balcony and throwing up all over the barbecue." Solis also indicated "he wanted to kick [Garcia's] ass." It appeared

---

[3] At trial, Vasquez testified that Solis called out to Garcia. Solis testified that Vasquez called out to Garcia.

to Pineda that Solis was drunk.  Garcia asked Solis to calm down and indicated they could talk later when Solis had calmed down.  As Solis and Vasquez walked toward the patio gate, Pineda heard Solis say, "that's how people from El Salvador behave, they have no balls."  Garcia is from El Salvador and Solis is of Mexican descent.

According to Solis's trial testimony, while he and Garcia were engaged in their casual, friendly conversation, Pineda came to the door separating the patio from the living room and started saying "bad words" to Solis.  Solis told Garcia "to calm her down."  Garcia refused.  Pineda told Solis she wanted him to leave, and she was "'fed up with all of [his] noise.'"  Solis again asked Garcia to calm Pineda down.  When Garcia again refused, Solis told Garcia, "'you're a faggot son of a bitch.'"  Solis and Garcia began to argue.  Solis raised his voice, but Garcia did not.  Solis admitted at trial that he made "insulting" and "vulgar" comments to Garcia, including calling Solis a "cerote."  Solis knew the word "cerote" is a Salvadoran expression meaning "turd."  Solis denied he threatened "to kick [Garcia's] ass."

Vasquez "paid no attention" to what Solis and Garcia were saying to each other.  But when he realized they were arguing, Vasquez "grabbed [Solis] by the shoulder," and told him, "'Let's get out of here now.'"  Solis cooperated with Vasquez and the two men walked away, exiting the patio and moving toward Vasquez's apartment.

Pineda walked into the kitchen of her apartment with her grandson.  She could still hear Solis making "insulting" comments about Garcia as he and Vasquez walked away.  Garcia was telling Solis to leave.  Pineda saw Garcia enter their apartment and go into his bedroom.

As Solis was walking away from Garcia and Pineda's patio, he "heard the "cocking of [a semiautomatic] weapon."  He also heard Garcia say, "'I'm going to kill you, son of a bitch.'"  Solis turned and saw the "flashing of the gun."  He asked Garcia to calm down.  He walked toward the stairs leading to his apartment.  Garcia continued to fire shots at him.  Bullets struck Solis's buttocks and right side.  Solis fell to the ground and tried to cover up to protect himself.  As Garcia continued shooting, Solis started

dragging his body toward the parking lot.  He felt another bullet strike his left leg.  After Garcia stopped shooting, Solis saw Garcia running toward the parking lot.

When Pineda heard gunfire, she exited her apartment.  She saw Garcia with a gun in his hand, firing at Solis.  After Garcia stopped shooting, Pineda saw Garcia running toward the parking lot.

Officers arrived at the scene and called for an ambulance for Solis, who was conscious and able to answer questions.  One of the officers observed at least three bullet entry wounds on Solis's back.  Solis told officers "Melvin" shot him.  Officers interviewed Pineda after learning she was "Melvin's" girlfriend.  Pineda declined to provide Garcia's full name or date of birth.  Officers discovered Garcia's identity after searching his apartment and locating his passport and vehicle registration.

At the scene officers recovered 14 spent shell casings, nine-millimeter caliber.  They also discovered one live round on Garcia and Pineda's patio and three spent rounds, including one that had entered the apartment next door (all nine-millimeter caliber).

The day after the shooting Garcia fled to Las Vegas, Nevada with Pineda and her daughter.  While in Las Vegas, Garcia sold the pickup truck registered in his name.  About a month after the shooting, Garcia was arrested in Las Vegas and brought back to California.

Solis was in the hospital for two months.  He underwent seven surgeries to repair damage to his right leg.  When he was released from the hospital, he was confined to a wheelchair.  In November 2012, more than nine months after the shooting, Solis was able to start walking again using crutches and thereafter a cane.  At the time of trial, Solis still experienced daily pain in his right leg.

**Defense Evidence**

### Garcia's testimony

Garcia testified in his defense.  He stated he was born in El Salvador.  When he was 11 years old, a "heavily armed" military "death squadron" affiliated with the government kicked down the door of his family's home in El Salvador.  The men ordered Garcia and his sister, mother, father and uncle to get on their knees.  Then the men took

5

Garcia's uncle and father outside and shot them with rifles. Garcia witnessed the executions from about 20 feet away. Garcia grew up wanting to seek revenge. He joined the army when he was 16 years old.

When Garcia first became acquainted with Solis he believed Solis was "a good person" and "a normal neighbor." Garcia would come into contact with Solis "frequently" in the apartment complex parking lot when Garcia returned from work. Over time, however, Garcia's perception of Solis's demeanor and attitude changed. In 2010, Garcia saw the police arrest Solis at the apartment complex after Garcia heard a woman crying and "very loud yelling" coming from Solis's apartment. In 2011, the police again responded to the apartment complex looking for Solis after Garcia observed Solis banging on his (Solis's) apartment door with a metal pipe. Solis fled before the police arrived, dropping the pipe on the staircase, climbing on Garcia's truck, jumping on top of a van, and entering the school yard next to the apartment complex. About once a month, Garcia would hear a male yelling inside Solis's apartment. Garcia assumed the male was Solis because Solis was the only man who lived in that apartment. Early one morning, Garcia heard a woman in Solis's apartment screaming, saying "she wanted to jump from the apartment" and "kill herself." All of these incidents changed Garcia's opinion of Solis. Garcia no longer perceived Solis as "a calm person." Garcia no longer trusted Solis.

In the evening on January 27, 2012, Garcia had just arrived back from the liquor store, and was "placing the box with beer on the table" in the living room, when he heard Solis call his name. Garcia went outside on his patio and saw Solis and Vasquez standing by the patio gate. Solis motioned to Garcia, indicating he wanted to talk. Vasquez told Garcia they wanted to talk to him upstairs in Solis's apartment. Garcia declined the invitation to go upstairs, but offered the men a beer. They accepted, and the three men began drinking beer.

Solis asked Garcia if it "'upset'" him when Solis played music in his apartment. Garcia said it did not, and he asked why Solis was making that inquiry. Solis explained that on two occasions management had come to his apartment and told him "'to quiet

6

down'" because there had been noise complaints "'from downstairs.'" Garcia stated he had "not complained to anyone" and did not know about the complaints. Solis asserted, "it's obvious that everything bothers you." Garcia asked what Solis meant. Solis responded, "'When I fuck, I like to fuck until I messed up the bed. And I think that [upsets] you.'" Solis made faces at Garcia, "mocking" him. Garcia became "upset."

Garcia asked Solis to leave his patio. Pineda's daughter and grandson were standing by the door separating the patio from the living room, and Garcia did not want them to hear Solis's comments. Solis replied, "'I don't get you. You have no balls. Why don't you stand by what you say. I don't get you.'" Solis "continued offending" Garcia. He stated when Garcia "cooked carne asada it made him [want] to throw up." He also told Garcia "it bothered him" when "the kids" ran around downstairs. Solis was yelling. Garcia, who was "heating up a little bit" by this point, reiterated he wanted Solis to leave. He told Solis he "did not want to have any problems with him." Solis stuck out his chest and gestured that he wanted to fight Garcia.

Vasquez grabbed Solis's shoulder, told him they should leave, and tried to guide him off of the patio. Solis told Vasquez, "'No. Look, this fucking cerote, son of a bitch, he has no balls.'" Garcia felt insulted by Solis's use of this derogatory Salvadoran expression, meaning "piece of shit."[4] Garcia saw Vasquez and Solis walk to the stairs leading to Solis's apartment.

Garcia felt "threatened" and "humiliated," and concerned that Pineda and the children were in the living room witnessing these events. The children were scared and crying. Garcia was "in [his own] house" and he felt he "had to defend [his] rights because [his] family was there." For these reasons, he walked inside his apartment and retrieved a nine-millimeter handgun from a drawer in the bathroom. Then he went to a

---

[4] Garcia called as a witness Alicia Luper-Gallont, one of the court's Spanish language interpreters who translated trial testimony in this case. She is from El Salvador and testified the word "cerote," meaning "piece of shit" or "turd," can have a discriminatory tone and be insulting to a Salvadoran if used by a person not of Salvadoran descent.

bedroom closet and retrieved a magazine from a jacket pocket. While in the bedroom, he loaded the gun with the magazine and chambered a round. The magazine held 15 bullets. He placed the gun in the waistband of his pants. Garcia returned to his patio where he could see Solis and Vasquez standing next to the stairwell. Vasquez was holding onto Solis's right arm. Solis was yelling that "he was going to beat the shit out of" Garcia.

Solis shook Vasquez off of him, moved toward Garcia, and repeated, "'I'm going to beat the shit out of you.'" Garcia felt afraid and provoked and believed Solis "was going to attack" him. From inside his patio, he fired two shots at Solis. Solis moved backward and fell down. Garcia remembered "discharging the weapon" and firing at Solis "several [more] times."

Garcia denied he tried to kill Solis, stating he did not aim for Solis's head, but rather shot "downwards toward the floor." Garcia acknowledged Solis was on the ground while he was firing down at the ground and some bullets struck Solis. Garcia also admitted: "I was so mad at that time that I was trying to teach him a lesson so he would not disrespect me that way."

Explaining why he continued to fire the gun after Solis fell to the ground, Garcia stated: "I wasn't thinking any more. My mind went blank. I was not thinking anything at that moment. I don't know. Everything happened very fast." Garcia added, "I wasn't conscious anymore." When the prosecutor asked Garcia if he fired the gun at Solis because he was "angry with him," Garcia responded: "It was a combination of everything all together. Fear and anger. Loss of control. I lost my mind." Garcia stated he "was confused."

Garcia fled the scene in his truck and disposed of the gun in a garbage can. He returned to his apartment the next day, picked up his family, and drove to Nevada where he sold his truck. He was arrested in Nevada about a month after the shooting.

**Expert testimony**

Forensic psychiatrist Jack Rothberg, M.D., testified for the defense. The trial court appointed him to evaluate Garcia's mental state at defense counsel's request. Defense counsel asked Dr. Rothberg whether Garcia's traumatic childhood experience in

El Salvador "might have had some role" in the shooting. Dr. Rothberg reviewed the arrest report in this case and "letters of recommendation" from Garcia's employers, coworkers, and neighbors. The people who wrote letters expressed that the shooting "was really out of character [for Garcia] and that it was really in opposition to anything they had ever seen personally." Dr. Rothberg also interviewed Garcia and Pineda.

Dr. Rothberg formed the opinion Garcia suffers from post traumatic stress disorder (PTSD) resulting from the executions of his uncle and father in his presence. Thirty years after that experience in El Salvador Garcia was "still having regular flashbacks." When Solis taunted, belittled and threatened Garcia in his home in front of his family, "it created a sense of helplessness" in Garcia like the helplessness he felt when he witnessed the murders of his uncle and father at his childhood home. Dr. Rothberg opined Garcia's "PTSD was reactivated in a way by these specific events that in his mind mirrored some of what he experienced when he was a young child." Due to his PTSD, Garcia perceived the situation with Solis as "ten times" more "threatening to him than a[n] ordinary person who did not have that [childhood] experience" in El Salvador. Garcia's reaction to the situation with Solis was "proportionate" to his "distorted" perception of the situation. Dr. Rothberg believed Garcia experienced "a state of hyper alertness" during the altercation with Solis, and also "had a hyper sensitivity to what was going on around him."

During cross-examination, Dr. Rothberg stated he was not aware Garcia testified he wanted to teach Solis a lesson. Knowledge of that testimony caused Dr. Rothberg's opinion to change "somewhat" because Garcia's statement "shows a little more planning" on his part regarding the shooting. Dr. Rothberg explained: "You can have the PTSD and you can have some other elements thrown into it. He was not totally out of touch with reality. So there may have been some rational elements[—wanting to teach Solis a lesson—], and there may be a great deal of distortion from his prior experiences" and the resulting PTSD.

9

### Character witness testimony

#### Jason Bardoner

Jason Bardoner worked with Garcia as a coworker and then an employer between 2006 and 2012. Garcia worked as a part of a crew performing window installation. Bardoner was surprised to learn about the shooting because he knew Garcia "to be a very easy going," peaceful, nonviolent, family man. Bardoner had never witnessed Garcia in a verbal or physical confrontation and had never seen Garcia lose his temper. Bardoner's opinion of Garcia would not change if he learned Garcia had a 1996 battery conviction.

#### Ricardo Pineda

Ricardo Pineda is the son of Garcia's girlfriend (Martha Pineda). He had known Garcia for 14 years. Garcia acted "like [his] father" and was Ricardo's role model. Ricardo knew Garcia to be a peaceful, nonviolent man who did not get into fights and did not start problems with people. Ricardo was surprised to learn about the shooting because Garcia is "a calm guy" and the altercation with Solis "was out of character for him." Ricardo's opinion of Garcia would not change if he learned Garcia had a 1996 battery conviction.

Ricardo lived with his mother and Garcia. For three to four years, Solis lived in the apartment above them. Ricardo heard Solis and his wife argue about twice a week.

#### Joanna Palma

Joanna Palma had known Garcia for 16 to 18 years. She lived in the apartment next door to Garcia and Pineda for a couple of months leading up to the shooting. She never observed Garcia being aggressive or fighting with anyone. Palma's opinion of Garcia would not change if she learned Garcia had a 1996 battery conviction.

Twice a month Palma would hear noises coming from Solis's apartment upstairs—shouting, a woman crying, and the sounds of items being thrown around.

### Verdicts and Sentencing

The jury found Garcia not guilty of attempted murder, but guilty of the lesser offense of attempted voluntary manslaughter (count 1; §§ 192, subd. (a), 664), and also guilty of assault with a firearm (count 2; § 245, subd. (a)(2)). The jury further found

10

Garcia personally used a firearm (§ 12022.5, subd. (a)), and personally inflicted great bodily injury on Solis (§ 12022.7, subd. (a)), during commission of the attempted voluntary manslaughter and assault with a firearm.

On count 1, the trial court sentenced Garcia to 18 years and six months in prison—the upper term of five years and six months for the offense, plus a consecutive upper term of 10 years for the firearm enhancement, plus a consecutive term of three years for the great bodily injury enhancement. The court imposed and stayed the sentence on count 2—the upper term of four years for the offense, plus a consecutive upper term of 10 years for the firearm enhancement, plus a consecutive term of three years for the great bodily injury enhancement.[5]

## DISCUSSION

**Duty to Instruct Jury on Unconsciousness**

Garcia did not ask the trial court to instruct the jury on the defense of unconsciousness. On appeal, however, he contends the trial court committed reversible error in not instructing the jury sua sponte on unconsciousness, using CALCRIM No. 3425. This instruction states:

"The defendant is not guilty of *<insert crime[s]>* if (he/she) acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.]

"Unconsciousness may be caused by (a blackout[,] / [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] *<insert a similar condition>*).

"The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the

---

[5] As the Attorney General points out, the trial court imposed a court security fee of $40 under section 1465.8. This statute requires the court to impose a $40 fee for each of the defendant's convictions. (§ 1465.8, subd. (a)(1) ["To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense"].) Garcia was convicted of two offenses. Thus, the court should have imposed $80 in court security fees. Garcia does not dispute this error. As set forth below, we modify the judgment accordingly.

11

defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious, in which case you must find (him/her) not guilty." (CALCRIM No. 3425; § 26 ["All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Four -- Persons who committed the act without being conscious thereof."].)

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) A trial court's duty to instruct sua sponte on a particular defense is "limited, arising 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 195.)

At trial Garcia did not rely on the defense of unconsciousness—a complete defense to the crimes. He relied on imperfect self-defense and, in the alternative, heat of passion. Defense counsel argued, due to his PTSD, Garcia had an unreasonable belief as to the amount of danger Solis posed and the amount of force he needed to use to defend against the danger. Garcia's expert, Dr. Rothberg, did not testify that Garcia would have experienced "unconsciousness" at any point during the shooting due to his PTSD. Defense counsel also argued Solis's actions and comments would have inflamed the passions of a reasonable person. Defense counsel denied Garcia was guilty of attempted murder but conceded Garcia was guilty of attempted voluntary manslaughter and assault with a deadly weapon.

Now, on appeal, in support of his belated unconsciousness theory, Garcia points to his testimony explaining why he continued to fire the gun at Solis even after Solis had fallen to the ground: "I wasn't thinking any more. My mind went blank. I was not thinking anything at that moment. I don't know. Everything happened very fast." Garcia added, "I wasn't conscious anymore." When the prosecutor asked Garcia if he fired the gun at Solis because he was "angry with him," Garcia responded: "It was a

12

combination of everything all together.  Fear and anger.  Loss of control.  I lost my mind."  Garcia stated he "was confused."

This testimony does not constitute substantial evidence demonstrating Garcia was legally unconscious at the time he fired the gun at Solis.  Garcia does not assert he was unconscious when he went inside his apartment and retrieved and loaded the gun after Solis and Vasquez had exited his patio.  Nor does he assert he was unconscious when he fired the first two shots after observing Solis shake off Vasquez and move toward him and hearing Solis repeat, "'I'm going to beat the shit out of you.'"  Garcia testified he remembered "discharging the weapon" and firing at Solis "several [more] times" after Solis fell down.  He recalled shooting "downwards toward the floor," and not aiming for Solis's head, as Solis lay on the ground.  He was aware that some of the bullets struck Solis as he lay on the ground.  Considering the entirety of Garcia's testimony, it is clear Garcia was conscious as he discharged the gun 14 times and then fled the apartment complex.  Due to PTSD, he may have had a distorted perception of the danger Solis posed, but his testimony demonstrates he was aware of his surroundings and his actions.

Moreover, Garcia's belated assertion of this complete defense to the crimes is inconsistent with his concession at trial that he is guilty of attempted voluntary manslaughter and assault with a firearm.

For these reasons, the trial court did not have a sua sponte duty to instruct the jury on the defense of unconsciousness.

**Mitigating Factor of Provocation Does Not Preclude Upper Term Sentence**

Garcia contends the trial court was required to find provocation as a mitigating factor precluding the upper term sentence for attempted voluntary manslaughter and the firearm enhancement.

Section 1170, subdivision (b), states:  "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court.  At least four days prior to the time set for imposition of judgment, either party or the victim, or the family of the victim if the victim is deceased, may submit a statement in aggravation or mitigation.  In determining

13

the appropriate term, the court may consider the record in the case, the probation officer's report, other reports, including reports received pursuant to Section 1203.03, and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, . . . and any further evidence introduced at the sentencing hearing.  The court shall select the term which, in the court's discretion, best serves the interests of justice.  The court shall set forth on the record the reasons for imposing the term selected and the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law. . . ."

Under section 1170, a trial court is "required to specify reasons for its sentencing decision," but is not "required to cite 'facts' that support its decision or to weigh aggravating and mitigating circumstances."  (*People v. Sandoval* (2007) 41 Cal.4th 825, 846-847.)  We review the court's sentencing decision for abuse of discretion.  "[A] trial court will abuse its discretion under [section 1170] if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision" (e.g., waiver or exercise of right to jury trial, defendant's alienage).  (*Id*. at p. 847.)

In preparation for the sentencing hearing, the trial court reviewed the probation report, which recommended an upper term sentence.  The court also reviewed the parties' sentencing memoranda.  In his memorandum, Garcia requested the court impose the low term on the offense and the middle term for the firearm enhancement.  Garcia argued the mitigating factors—that Solis provoked the incident and Garcia reacted in the manner he did due to his PTSD—far outweighed the aggravating factors.  Garcia listed his use of a firearm and infliction of great bodily injury on Solis as aggravating factors.  Garcia attached letters and investigative reports regarding his good character and nonviolent nature, and Solis's "loud and rude" nature.

The People's sentencing memorandum requested the trial court impose the upper term on the offense and the firearm enhancement.  The People listed several factors in aggravation, including that the victim was vulnerable (unarmed, walking away from Garcia's home, and lying on the ground after Garcia fired the first two of 14 shots), and that the crime involved great violence and a high degree of cruelty, viciousness and

14

callousness. The People also argued Garcia's crimes showed planning and sophistication, pointing to Garcia's testimony that he wanted to teach Solis a lesson and the fact Garcia went inside his apartment to retrieve and load the gun and chamber a round before returning to the patio. The People further argued Garcia engaged in a pattern of violent conduct indicating a serious danger to society in that he fired 14 rounds in an apartment complex, with one of those rounds entering his neighbor's apartment. The People disputed Solis's provocation was sufficient to mitigate the shooting, but acknowledged Garcia's "insignificant record of criminal conduct" was one mitigating factor.

At the sentencing hearing, Solis and his mother addressed the court with victim impact statements. Pineda and her daughter spoke in support of Garcia.

Before imposing sentence, the trial court engaged in a lengthy discussion of the facts and circumstances of the case and the aggravating and mitigating factors. The court noted Solis taunted Garcia and Garcia felt humiliated and threatened. Garcia indicated he wanted to teach Solis a lesson. He also indicated "[h]e became very mad" and "started to heat up." Garcia went inside his apartment, retrieved and loaded a gun, brought it outside, and fired 14 rounds at close range upon an unarmed man who was disabled after a couple of shots. Garcia did not render aid. He fled the state and attempted to avoid detection. The court found the callous and violent nature of the crimes was an aggravating factor.

The trial court did not find Garcia's minor criminal record to be a mitigating factor, but rather a neutral factor. The court recalled Garcia had theft and driving under the influence convictions.

In discussing provocation, the trial court stated: "He [Garcia] was provoked. Was it great provocation, was the question. People get into heated arguments all the time. They say terrible things to one another. I think most judges would tell you most acts of violence arise out of neighbor disputes. It's just the way people are. But in terms of mitigation, as I look through the codes and rules of court, the question is whether or not the defendant was responding to great provocation. And I don't think that he did. I don't

15

think that the level of provocation was such that it even approximates the response, even remotely. Mr. Garcia had an opportunity to go into his house and close the door and fume inside of his house. If that were the case, then his [step]daughter would not have to come here and sob over the consequences that might befall her father. This incident would never have happened. [¶] Your memorandum points to something different. It's suggesting that had there not been taunting, this incident would not have happened. That could very well be true as well; but the response to the taunting was so over-the-top in terms of what normal people would expect in a law-abiding society that the provocation element does not sufficiently satisfy the court as a factor in mitigation."

The trial court stated it had considered PTSD, and believed the jury had considered the evidence of PTSD in finding Garcia guilty of attempted voluntary manslaughter instead of attempted murder.

In "balancing" the aggravating and mitigating factors, the trial court imposed the upper term of five years and six months for the offense, finding the following aggravating factors: "[T]he crime did involve a great degree of violence and . . . his conduct disclosed a callousness and cruelty towards an unarmed victim who was vulnerable to that type of assault and nearly died." The court also imposed the upper term of 10 years for the firearm enhancement, finding the following factors in aggravation: "the significant number of rounds that were actually discharged by Mr. Garcia into and at the victim," at close range, placing others in danger as evidenced by the round that entered his neighbor's apartment. Finally, the court imposed the three-year term for the great bodily injury enhancement. Thus, the court sentenced Garcia to the maximum term of 18 years and six months.

When defense counsel objected to the imposition of the upper term sentence and highlighted factors in mitigation (provocation, Garcia's character, and PTSD), the trial court responded: "[I] have taken into consideration those mitigating factors that you have mentioned; and in my view, they are substantially outweighed by the defendant's conduct that night. And, as I previously said, the aggravating factors in my view outweigh the mitigating factors."

16

We review the trial court's decision to impose the upper term for abuse of discretion. (*People v. Sandoval*, *supra*, 41 Cal.4th at p. 847.) In accordance with section 1170, the court stated appropriate reasons for imposing the upper term. The court acknowledged the evidence of provocation, PTSD, and Garcia's good character, but found these factors did not outweigh the factors in aggravation, including the violent and callous nature of the offense, the vulnerability of Solis, and the serious danger in which Garcia placed other members of the community. The court acknowledged Garcia was provoked, but found that provocation was not sufficient to warrant imposition of a middle or low term sentence given the other facts and circumstances of the crimes—going inside to retrieve and load a gun and then returning outside, firing 14 rounds at an unarmed man at close range, continuing to fire numerous rounds at him as he lay defenseless on the ground, and placing neighbors in serious danger. We have no cause to disturb the trial court's decision.

**No Dual Use of Facts in Imposing Sentence**

Garcia contends the trial court improperly used the same fact—great violence—to impose the upper term on the offense, to impose a consecutive upper term on the firearm enhancement, and to impose a consecutive term for the great bodily injury enhancement. He asserts: "The base term's great violence was part and parcel of the gun use enhancement aggravated for the significant number of rounds actually discharged at and into Solis and the enhancing great bodily injury inflicted on him. Reliance on the great violence towards Solis to aggravate the base term was a prohibited dual (triple) use of fact when an upper 10-year weapon use was aggravated for the significant number of rounds discharged at and into Solis and the 10-year upper weapon use and a 3-year great bodily injury enhancement were additionally imposed consecutively."

Garcia acknowledges his counsel did not object on these grounds below. Thus, he has forfeited this claim. (*People v. Scott* (1994) 9 Cal.4th 331, 356; *People v. de Soto* (1997) 54 Cal.App.4th 1, 7-8.) We nonetheless address the claim on the merits because Garcia asserts an ineffective assistance of counsel claim based on his counsel's failure to object regarding dual use of facts.

17

"In exercising his or her discretion in selecting one of the three authorized prison terms referred to in section 1170(b), the sentencing judge may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision. The relevant circumstances may be obtained from the case record, the probation officer's report, other reports and statements properly received, statements in aggravation or mitigation, and any evidence introduced at the sentencing hearing." (Cal. Rules of Court, rule 4.420(b).)

The trial court did not err in imposing the upper term, and counsel was not ineffective in failing to object to the court's statement of reasons for imposing the upper term. One of the reasons the court stated for imposing the upper term for the offense was the vulnerability of the victim. (Cal. Rules of Court, rule 4.421(a)(3).) One of the reasons the court stated for imposing the upper term on the firearm enhancement was that Garcia placed members of the community, other than the victim, in serious danger by discharging the gun in an apartment complex, as evidenced by the fact a round entered a neighbor's apartment. "Only a single aggravating factor is required to impose the upper term." (*People v. Osband* (1996) 13 Cal.4th 622, 728.) The trial court imposed the great bodily injury enhancement after the jury found the special allegation to be true based on the evidence of Solis's injuries (set forth in detail above). The trial court was not required to state a reason for imposing the three-year term, the only term provided in the statute. Nor was the court required to state additional reasons for imposing consecutive terms on the enhancements, as Garcia seems to suggest.

## DISPOSITION

The judgment is modified to reflect the imposition of $80 in court security fees pursuant to section 1465.8 ($40 for each of the two convictions).  As so modified, the judgment is affirmed.  The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


CHANEY, Acting P. J.


We concur:



JOHNSON, J.



MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.